No. 36,062

OLIVE BROWNING and EARL BROWNING, *Appellants*, v. C. H. WEAVER, JOHN C. FARBER and B. F. STAPLETON, *Appellees*.

(146 P. 2d 390)

Opinion filed March 4, 1944.

*Ben Jones*, of Lyons, argued the cause, and *Edward Wahl*, of Lyons, was on the briefs for the appellants.

*C. E. Chalfant*, of Hutchinson, argued the cause, and *Rubert G. Martin*, of Lyons, *Walter F. Jones*, *Harold R. Branine* and *J. Richards Hunter*, all of Hutchinson, were on the briefs for the appellees.

The opinion of the court was delivered by

SMITH, J.: This is an action wherein the trial court was asked to declare an oil and gas lease to be terminated by its own terms on account of the failure of the lessee to comply with the terms of the

lease, and for damages. Judgment was for the defendants. Plaintiffs appeal.

Plaintiffs are husband and wife. The petition alleged that they owned the land in question; that on May 13, 1941, they gave Stark an oil and gas lease on it for a term of five years and as long thereafter as oil or gas should be produced; that the lease contained a provision as follows:

"If no well be commenced on said land before the 13th day of May, 1942, this lease shall terminate as to both parties, unless the lessee on or before that date shall pay or tender to the lessor, or to the lessor's credit in The Lyons State Bank at Lyons, Kansas, or its successors, which shall continue as the depository regardless of changes in the ownership of said land, the sum of Eighty and No/100 Dollars, which shall operate as a rental and cover the privilege of deferring the commencement of a well for Twelve months from said date."

The petition alleged further that this lease was assigned to Weaver on May 7, 1942; that Weaver failed to cause any well to be commenced on the land on or before May 13, 1942, and failed to pay or tender to plaintiffs, or to their credit in the Lyons State Bank at Lyons, Kan., $80 on or before that date, and that the lease by its terms and failure of the lessee to comply was terminated; that Weaver assigned an interest on October 22, 1942, to Farber; that plaintiffs on November 16, 1942, notified Weaver and Farber that the rent had not been paid; that thereafter Weaver, with intent to defraud plaintiffs, made a pretended assignment of the lease to Stapleton for the purpose of hampering plaintiffs in their efforts to cause it to be canceled of record; that on January 11, 1943, plaintiffs notified all the lessees that the delay rental had not been paid and plaintiffs desired the lease released of record and unless it was released within 20 days an action would be begun; that the lease had not been released and was a cloud on plaintiffs' title. The petition further alleged that the land adjacent had been leased and oil was being produced from it and the land of plaintiffs was being exposed to waste; that plaintiffs were unable to lease their land on account of the cloud on their title; that the lease at the time the action was filed was of the value of $1,600. The prayer of the petition was for a judgment that the lease was terminated, ordering it canceled and quieting plaintiffs' title and for a judgment for $1,600 damages, $500 attorney fees and exemplary damages.

Weaver and Stapleton filed an answer in which they made a general denial. They admitted plaintiff's ownership, the execution of

the lease, the transfer to Weaver on May 7, 1942; that Weaver failed to drill on the lease or to deposit the $80 to plaintiffs' credit in the Lyons State Bank at Lyons, Kan., on or before May 13, 1942, and the assignments to Farber and to Stapleton.

The answer denied that defendants failed to pay the $80 on or before May 13, 1942; that they had violated any provision of the lease and that Weaver fraudulently made the assignment to Stapleton. The answer further alleged that when Stark secured the lease he had leases on adjacent land and planned to drill a test well either adjacent to or on the land in question; that he was unable to finance this drilling and early in May offered to sell Weaver the leases in question provided he would drill; that Weaver had worked with Stapleton for years and Stapleton had the legal title to many leases upon which he had drilled; that on May 7, 1942, Weaver purchased several leases on land in the vicinity from Stark; that on the same day the leases were assigned to Weaver by Stark; that he prepared and delivered a rental remittance and banker's receipt in favor of the Chase State Bank; and that Weaver did not know the provision of the lease as to where the money was to be paid but accepted the statement of Stark that the rentals were payable to the Chase State Bank and on May 9, 1942, Weaver caused to be deposited in the Chase State Bank the sum of $80 to the credit of plaintiffs and on that date Weaver believed that the original lease provided for the payment of delay rentals to the Chase State Bank; that immediately thereafter the Chase Bank on behalf of Weaver tendered to plaintiffs the $80 deposited in the bank and advised plaintiffs that the money was on deposit for the account of plaintiffs. The answer then alleged that Weaver believing that the rent in question had been paid contracted on July 29, 1942, for the drilling of a test well on a location about 660 feet south of plaintiff's land; that drilling was commenced during August, 1942, and in October, 1942, oil and gas in paying quantities was discovered; that Weaver paid for the drilling of this well in cash and assignments of oil and gas leases over $16,000, all this expense being incurred believing that Weaver held a valid lease upon the land in question; that only after the well in question was proved to be a producer in October, 1942, did plaintiffs on or about November 16, 1942, notify Weaver that they were claiming that the delay rentals had not been paid; that plaintiffs remained silent from May 13, 1942, to November 16, 1942, and retained the right and privilege of accepting the $80 as delay rentals

if the well drilled had proved to be a noncommercial producer; that prior to the drilling of this well the lease on plaintiffs' land had no value; that the conduct of defendants showed that they had no intention to abandon this lease; that the payment of the $80 to the Chase State Bank was in full compliance with the terms of the lease; that the act and conduct of plaintiffs, as alleged, estopped them from contending that the lease was not valid; that the $80 paid by Weaver to the Chase State Bank has never been returned to him; that by reason of the expenditure of large sums of money the lease in question had a potential value of about $4,000 and it would be inequitable to now permit plaintiffs to cancel it.

For a cross petition, defendants made the allegations of the answer a part, and alleged that plaintiffs were denying the validity of the lease and prayed judgment that the lease in question was a valid lease.

In his answer Farber adopted the allegations of the answer of Weaver and Stapleton and prayed for the same relief.

The plaintiff moved that all the allegations in the answer concerning the Chase State Bank tendering the $80 deposited for Browning and the drilling of the well by Weaver, and Browning waiting until he saw whether the well was a producer before he claimed the payment was not made, and about his being estopped, be stricken. This motion was overruled. The case was submitted to the court without a jury. When it came on for trial the plaintiffs moved for judgment on the pleadings. This motion was overruled. The trial court then stated that the burden of proof was upon the defendants, whereupon counsel for plaintiffs moved for judgment on the pleadings and opening statement. This motion was overruled. At the close of the evidence of defendants plaintiffs demurred to it. This demurrer was overruled. After hearing the evidence of both parties the trial court found the issues in favor of the defendants and rendered judgment accordingly. Hence this appeal.

It will be noted that the plaintiff took the position in trial court, and takes it here, that the answer of defendants did not state any defense to the cause of action set out in the petition. Plaintiffs argue that the lease required that one of three things should have been done to extend it past May 13, 1942: First, the drilling of a well on the land on or before May 13, 1942; second, payment of $80 to the lessor, or third, payment to the lessor's credit in the Lyons State Bank of $80. They argue that none of these three

alternatives was taken and that, therefore, the lease was terminated. They insist that the lease called for payment of the delay rental at the Lyons State Bank and nowhere else except to Browning and his wife individually.

In view of this argument, we shall examine the undisputed evidence as to what was done. On May 7, 1942, this lease, along with other leases, was assigned to Weaver. On May 9, 1942, the $80 delay rental on the lease in question was received by the Chase State Bank and deposited to plaintiff's credit. A duplicate deposit slip was mailed to the Brownings at their address. Browning, one of the plaintiff's, testified that he received the deposit slip but he could not say when; that the children got the mail that day and placed this mail with some circulars in a drawer; on July 29 a contract for drilling the offset well was made; that on August 19 it was commenced. During August plaintiff saw the beginning of the drilling of this well. He then began looking for the deposit slip. He found it after inquiring at both banks and learning from the Chase State Bank that the money was there for him. He testified that he inquired at the Lyons State Bank and on learning that the delay rental money had not been paid to that bank he stopped at the Chase State Bank and found for the first time that the rentals had been paid at the Chase State Bank by Weaver, who he knew was interested in drilling the offset well. At that time all he needed to do to get that money into his actual possession was to write a check for it. He testified, in part, as follows:

"I didn't take the money for the reason that they charge bank service, and I wasn't going to accept any less than $80. I might have taken it if it hadn't been for the bank service, but I was not going to accept any less."

The situation does not appear any different in this respect than if the money had been deposited in the Lyons bank. Early in October when the final potential was taken for this well it showed a potential production of 1,320 barrels of oil a day. On November 7, 1942, Weaver received a notice for the first time from Browning that the delay rental had not been paid when due. He then found his canceled check which he had sent to the Chase Bank and his rental receipt. There were then some negotiations between Weaver and the Brownings wherein Weaver attempted to reach an agreement with Browning as to ratifying the lease on the land in question so that a well could be drilled on it. These negotiations failed and this action followed. There was evidence from which the trial court was

warranted in finding that the delay rental money for this particular lease was sent to the Chase State Bank by mistake, because out of several leases in the same block this was the only one that required that the rental should be deposited in the Lyons Bank. All the rest of them provided that it should be paid to the Chase State Bank; that Weaver thought in good faith that he was sending the money to the right bank; that he would not have drilled the well where he did drill it had he not believed that the money on the Browning lease had been paid and that the fact that this well was a producer increased the value of the Browning lease.

Under such circumstances should we hold that the lease had expired by its own terms on account of failure of the lessee to comply with its terms either by drilling or paying the delay rentals?

The question has received the attention of this court on a number of occasions. We have uniformly held that we would consider the surrounding facts and circumstances and upon those would base our decision as to whether equity did require that the lease should be held to have expired on account of noncompliance. A clause such as the one with which we are dealing here is known as the "unless" clause. It is a common provision in oil and gas leases. In *Kays v. Little*, 103 Kan. 461, 175 Pac. 149, the lease provided that the delay rental money should be paid quarterly. A twenty dollar payment was due on December 2, 1916. A check in a registered letter had been sent by the lessee to his agent in Eureka with which to pay this rental. It was not received by the agent until December 5, 1916. On that date payment of the twenty dollars was tendered the lessor through the designated bank and the bank would not accept it. On December 2, 1916, an oil well had been drilled to a depth of about 1,600 feet at a cost of $16,000 on land adjacent. At the time of the trial it had been completed and was producing oil. This court said:

"The plaintiff attempted to enforce the forfeiture of Foster's rights under the lease, although Foster was diligent in doing what the lease required that he should do. He manifested no intention to abandon his rights under the lease, not even by neglecting to make any effort to pay the rental required until after the time fixed for that payment. He attempted to make those payments before the stipulated time. It was not through any act of his that the payment did not reach the plaintiff in ample time. Under the circumstances, it would have been inequitable to have granted the plaintiff the relief he asked."

It should be noted that the decision turned upon whether or not the conduct of the lessee had been such as to manifest an intention

to abandon his rights in the lease. It is pointed out in the decision that he had attempted to comply and that it was through no act of his that the payment did not reach the landowner. This opinion was distinguished twice within a few years, once in *Doornbos v. Warwick*, 104 Kan. 102, 177 Pac. 527. All that case did, however, was to point out under the particular facts and circumstances the lessee was not excused from strict performance of the conditions with reference to either drilling or paying delay rentals. The fact was that the lessee did not construe the lease as providing that the rentals should be paid in advance and hence did not so pay them. Also, in *Baldwin v. Oil Co.*, 106 Kan. 848, 189 Pac. 920, we held that under the peculiar facts and circumstances the lease had expired by its own terms by noncompliance. In that case there was no effort to pay the delay rentals and certain facts relied upon had prevented the completion of the well.

In *Gasaway v. Teichgraeber*, 107 Kan. 340, 191 Pac. 282, a check was put in the mail on the same day that the lease expired and did not reach the bank until the next day. No money had been expended in the drilling of a well in the meantime and we held that the payment was due on the day in question and there was no excuse for its not being paid when it was due.

All three of these cases, however, recognized the principles laid down in *Kays v. Little*, supra, that there are facts and circumstances which will excuse the lessee from strict compliance with the terms of the lease.

In *Parris v. Oil Co.*, 108 Kan. 330, 195 Pac. 879, the lease contained an "unless" clause. The rent was due July 24, 1919. A tender of payment was made that day but was not received because the bank had been instructed not to receive it. There was a question as to whether or not a party making a tender was the correct party. We are interested in the case because the court said:

"It is possible that the rule with reference to the tender of rent for the purpose of keeping in force an oil and gas lease may in some respects be less severe, the element of good faith being given greater weight in comparison with more formal exactions. For illustration, a payment which did not reach the lessor in time because of a delay in the mails has been upheld."

In *Young v. Arkansas Fuel Co.*, 117 Kan. 698, 232 Pac. 871, the lease provided that it was to end on December 7, 1921, if the delay rentals were not paid to the plaintiffs or to their credit in the Howard National Bank on that date. The defendants did not make this pay-

ment nor did they begin a well. They relied for a defense on the fact that they mailed a check in Oklahoma in plenty of time for it to have reached the bank before the day in question, but it was never received, and that they did not know it had not been received until they were served with notice that the lessor claimed that the lease had expired. In the meantime they had spent about $80,000 drilling wells in land adjacent to the land in question. We said:

"This court has held, however, that cancellation may be refused in such a situation as that here presented, where the default is unintentional and excusable and the lessee had expended considerable sums in developing tracts in the vicinity."

See, also, *Gloyd v. Midwest Refining Co.*, 62 F. 2d 483, also *Oldfield v. Gypsy Oil & Gas Co.*, 123 Okla. 293, 253 Pac. 298. The court in the latter case said:

"The act of the lessee, in forwarding the draft addressed to the depository named in the lease 15 days before the payment was due, is no less the expression of a clear intention to continue the life of the lease than if the draft had been received by the depository named in the lease, and to which the draft was addressed. As the lessee made a clear, unequivocal expression of its election to exercise its option to continue the life of the lease before the date the renewal payment was due . . . the contract must be construed in the light of the election exercised by the lessee."

See, also, *Brunson v. Carter Oil Co.*, 259 Fed. 656. In that case the rule claimed in the case of *Kays v. Little,* supra, was approved.

The latest discussion of this question is in *Stady v. The Texas Company*, 150 Kan. 420, 94 P. 2d 322. There the delay rental money was not paid to the bank named in the lease because the bank became defunct. It was not paid to the party named in the lease because that party had died and the lessee claimed it was not able to learn the identity of all the heirs. The action to cancel the lease was brought sometime after the date named. We held that the lessee had not done what he could have done, that is, secured the appointment of a trustee to receive the rental payments and had permitted the time to pass when this could have been done. The case turned upon that point.

In the case we are considering the lessee did everything that he could to evince his intentions to keep the lease in force. The court found and it is a matter of common knowledge that one who has a valid lease upon an 80-acre tract of land would not drill an oil well within 600 feet of it and permit the lease to expire while he was doing this drilling. The well drilled did about as much to ascertain

the value of the lease we are considering as it did to ascertain the value of the lease upon the tract where it was actually drilled.

Furthermore, this lessor actually had the money available to him in the Chase State Bank. He said in his own testimony that he did not draw it on the date he found it was there because he thought there would be a bank charge against it. All of the facts and circumstances lead us to the conclusion that was reached by the trial court, to the effect that the lessor watched the well being drilled and did not draw the $80 from the Chase State Bank because he wanted to be in a position so that if the well was a producer he could claim that the lease had expired by its terms and if it was a nonproducer he could then get his $80.

Equity under such circumstances will not permit us to hold that this lease had expired.

The judgment of the trial court is affirmed.